UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ONEIDA NATION,

                 Plaintiff,

        v.                                                    Case No. 16-C-1217

VILLAGE OF HOBART, WISCONSIN,

                 Defendant.

## DECISION AND ORDER ON BURDEN OF PROOF

Plaintiff Oneida Nation filed this action for declaratory and injunctive relief challenging the authority of the Village of Hobart to regulate the Nation and its officials with respect to activities occurring on the Nation's Reservation and on land held in trust for the Nation's benefit by the United States. More specifically, the Nation seeks a declaration that the Nation and its officials are not subject to the Village's Special Event Ordinance and an injunction enjoining the Village from enforcing the Ordinance against the Nation and its officials in their conduct of the Nation's annual Big Apple Fest. The Court has jurisdiction over the action under 28 U.S.C. § 1331 and 1362. The case is before the court on the Nation's motion to clarify the parties' burdens of proof in anticipation of their expert disclosures. The motion is now fully briefed and ready for decision. For the following reasons, the Nation's motion will be granted.

The Nation seeks an order specifying the following allocation of the parties' respective burdens of proof:

1. The Nation carries the burden of proof on the creation of the Oneida Reservation in the Treaty of 1838, 7 Stat. 566, and the applicability of the Indian Reorganization

Act (IRA), 25 U.S.C. § 5123, in 1934 to the Nation and its Reservation, except for the Nation's actual title to the trust parcels at issue.

2. The Village carries the burden of proof that the Oneida Reservation has been diminished or disestablished by an act of Congress or otherwise, any claim that the Nation does not hold trust or fee title to the parcels at issue, and other affirmative defenses it has or may raise in pleadings, specifically including any claimed exceptional circumstances that would allegedly justify the exercise of its jurisdiction over the Nation on the Reservation, notwithstanding the absence of express congressional authorization to do so.

ECF No. 59 at 1.

The Village agrees that the Nation has the burden of proving the creation of the Oneida Reservation in the Treaty of 1838 and the applicability of the IRA in 1934 to the Nation and its Reservation. The Village also concedes that it bears the burden of proof on the alleged disestablishment of the Oneida Reservation and on the existence of any exceptional circumstances that would permit the Village to exercise jurisdiction over the Nation's Reservation conduct. ECF No. 62 at 9. The Village maintains, however, that it is the Nation's burden to prove that the parcels involved in the Big Apple Fest are actually held in trust.

Before going further, some clarification of terms and a brief history are in order. The Oneida Reservation refers to the tract of land consisting of approximately 65,400 acres in northeast Wisconsin that was set aside by the United States for the benefit of the Oneida Indians then residing in the vicinity of Green Bay pursuant to the February 3, 1838 treaty with the First Christian and Orchard Parties of the Oneida Indians, 7 Stat. 566. Title to the land within the Oneida Reservation, like title to all land within Indian Reservations, was originally held in trust for the benefit of the tribe by the United States. As a result of the allotment statutes enacted by Congress at the end of the 19th century and the beginning of the 20th century, patents for the vast majority of the land held in trust

by the United States for the benefit of the Oneida Indians were issued to tribal members and title to those lands over time was transferred to, or acquired by, non-Indians in fee simple. *See Oneida Tribe of Wis. v. Vill. of Hobart*, 542 F. Supp. 2d 908, 912 (E.D. Wis. 2008) (*Oneida I*). At around this same time, the State of Wisconsin created the town of Hobart which included that part of the Oneida Reservation located in Brown County. *Id.* With the enactment of the IRA in 1934, however, and perhaps more importantly, with the substantial improvement in the Nation's economic condition after the passage of the Indian Gaming Regulatory Act of 1988, the loss of land within the Reservation to non-Indian ownership ceased and, to some extent, appears to have been reversed with the purchase of additional land by the Nation and the transfer of title to some parcels to the United States in trust pursuant to the IRA, 25 U.S.C. § 465. *Id.* at 912 13. At the same time, the population of the Town of Hobart continued to grow, and in 2002 the Town incorporated to become the Village of Hobart.

As a result of these policy changes and historical developments, the Village, which is situated entirely within the original Reservation boundaries, is currently comprised of land, title to which is held by non-Indian parties or entities, members of the Oneida Nation, the Oneida Nation itself, and the United States for the benefit of the Nation. Notwithstanding the changes in ownership of the land within the Reservation, however, the entire Village is considered Indian country under federal law, unless the Village is able to establish that Congress diminished the original Oneida Reservation's boundaries. *Nebraska v. Parker*, 136 S. Ct. 1072, 1078 79 (2016). The term "Indian country" means:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian

communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151; *see also DeCouteau v. District Cnty. Court*, 420 U.S. 425, 427 n.2 (1975) (noting that "[w]hile § 1151 is concerned, on its face, only with criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction").

This principle is key to the Nation's case. "Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States." *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998). The Village, of course, is treated as a subdivision of the State for present purposes. "[S]tate laws may be applied to tribal Indians on their reservations if Congress has expressly so provided." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987). Otherwise, "a State may validly assert authority over the activities of nonmembers on a reservation, and . . . in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members." *Id.* at 215 (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 331 32 (1983)).

Implicit in the Village's response to the Nation's motion is the assumption that the Village has unquestioned authority to enforce its ordinance within its boundaries on land that is not held in trust by the United States for the benefit of the Nation. As the foregoing discussion explains, however, that is not the law. Unlike *Oneida I*, this is not a case where the Village is seeking to exercise *in rem* jurisdiction over land that is held in fee by the Nation. *See Oneida I*, 542 F. Supp. 2d at 923 27. In this case, by contrast, the Village seeks to regulate the conduct of the Nation and its members within the boundaries of the Nation's Reservation. Unless the Village is able to show

4

that the Nation's Reservation has been diminished by Congress, *Cabazon* and not *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251 (1992), or *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), provides the rules governing the determination of the case.

It thus follows that the trust status of the land used in the Big Apple Fest is not central to the Nation's claims. It may be relevant to the issue of whether diminishment has occurred, *see Nebraska v. Parker*, 136 S. Ct. at 1081 82, but as the Village concedes, the Village has the burden of proof on that issue. To the extent it is relevant, then, the Village would also have the burden of proof as to the trust status of the various parcels of land on which the festival was held. But it should not be a difficult burden to meet since it would appear to be simply a matter of record.

The Nation presumably knows which parcels are held in trust by the United States for its benefit and would have direct access to the documentation that would be needed to establish its claim that certain parcels are in fact held in trust for it by the United States. In particular, the Nation must know what land it acquired and then transferred to the United States for its benefit. Regulations promulgated by the Department of Interior describe the process by which Indian tribes may apply to have property taken into trust pursuant to the land to trust provisions of the IRA. *See* 25 C.F.R. Part 151.1; *see generally* Mary Jane Sheppard, *Taking Indian Land Into Trust*, 44 S.D. L. REV. 681 (1999) (describing the process by which Indian tribes may apply to have property taken into trust). If it has not already done so, the Village should be able to direct a set of discovery demands to either the Nation or the Department of Interior that would elicit the information and evidence it would need to meet its burden on the issue. A certification that a diligent search failed

to disclose a record of such a transfer would be sufficient to establish that no such transfer occurred. Fed. R. Evid. 803(10).

The Village also argues that the Nation must not only demonstrate which lands are held in trust but must also prove that all of the activities associated with the Big Apple Fest occurred in Indian country. But again, in light of the previous discussion, it is clear that all of the events occurred within Indian country, absent proof by the Village that the Nation's Reservation has been diminished. The entire Village is in Indian country as that term has been defined by Congress and the Supreme Court, and thus all of the activities the Village seeks to regulate occurred in Indian country absent proof of diminishment.

Finally, the Village asserts that the Nation has the burden to prove how the Village's Ordinance interferes with its right to self-governance. As noted above, absent Congressional authorization, a State may only regulate the property or conduct of a tribe or tribal-member in Indian county in "exceptional circumstances." *Cabazon*, 480 U.S. at 215. It is the Village's burden to show that such circumstances exist here. Of course, one would certainly expect the Nation to counter any evidence the Village offers of exceptional circumstances with evidence of how the regulation the Village seeks to enforce interferes with its right to self-governance, but the Nation has no burden to offer such evidence in the sense that the Village automatically prevails in the event the Nation fails to do so.

**IT IS THEREFORE ORDERED** that the Nation's motion to clarify (ECF No. 59) is **GRANTED**.

**IT IS FURTHER ORDERED** that the parties bear the following burdens of proof, whether such matters are the subject of expert reports or otherwise:

1.  The Nation carries the burden of proof on the creation of the Oneida Reservation in the Treaty of 1838, 7 Stat. 566, and the applicability of the Indian Reorganization Act (IRA), 25 U.S.C. § 5123, in 1934 to the Nation and its Reservation.

2.  The Village carries the burden of proof that the Oneida Reservation has been diminished or disestablished by an act of Congress or otherwise, and other affirmative defenses it has or may raise in pleadings, specifically including any claimed exceptional circumstances that would allegedly justify the exercise of its jurisdiction over the Nation on the Reservation, notwithstanding the absence of express congressional authorization to do so; and

3.  This allocation of the burden of proof governs the exchange of opening expert reports due on November 15, 2017, and responsive and rebuttal reports due December 15, 2017 and January 15, 2018, respectively.

Dated at Green Bay, Wisconsin this   23rd   day of October, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
