UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ONEIDA NATION,

          Plaintiff,

    v.                                    Case No. 16-C-1217

VILLAGE OF HOBART, WISCONSIN,

          Defendant.

## DECISION AND ORDER

       This case represents another episode in the ongoing dispute between the Oneida Nation and the Village of Hobart over land use regulation and control. The Oneida Nation filed this action for declaratory and injunctive relief challenging the legal authority of the Village to enforce its Special Events Permit Ordinance, Chapter 250 of the Village Code, against the Nation, its officers, and its employees within the Village, which lies entirely within the 1838 boundaries of the Oneida Reservation. The action arises out of the Village's effort to enforce the Ordinance by requiring the Nation to obtain a permit for its annual Big Apple Fest. The Nation argues that as a federally recognized Indian tribe, it is immune from state and local regulations within its reservation and not subject to the Ordinance. The Village, on the other hand, challenges the Nation's claim that the boundaries of the original Oneida Reservation remain intact and contends that it is entitled to enforce the Ordinance to the extent necessary to protect the health, safety, and welfare of its residents and the public. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1362.

       Presently before the court are the parties' cross-motions for summary judgment. The Nation moves for summary judgment, claiming that its reservation was created by its Treaty of February

3, 1838, with the United States and that the original Reservation boundaries remain intact. It thus follows, the Nation contends, that the Nation and its officials and employees are not subject to the Ordinance as a matter of law and the Village should be enjoined from attempting to enforce it against them. The Village filed a cross-motion for summary judgment in which it argues that the 1838 Treaty under which the Oneida received their land did not create a reservation. Even if the Treaty did create a reservation, the Village argues that a 1933 decision by this court held that the Oneida Reservation was disestablished and that the Nation is collaterally estopped from relitigating its status. Alternatively, the Village argues that, even aside from the 1933 decision, this court should find that the Oneida Reservation has been disestablished or, at a minimum, diminished. The United States filed a brief in support of the Nation as amicus curiae. The motions have been fully briefed and argued by the parties.

Having fully considered the arguments set forth, I conclude that the Treaty of 1838 created a reservation that has not been disestablished. But the Nation's reservation has been diminished such that the Village may enforce the Ordinance on those lands not held in trust by the United States for the benefit of the Nation. In addition, I conclude that the Nation's sovereign immunity forecloses the Village's counterclaim for monetary damages. Accordingly, and for the reasons set forth below, the Nation's motion will be only partially granted as to the Village's counterclaim for damages. The Village's motion for summary judgment dismissing the Nation's claims for declaratory and injunctive relief will be granted. Summary judgment on the Village's counterclaim for declaratory relief that the Ordinance may be enforced as to covered activities on fee land owned by the Nation, as well as activities on public roadways, rights-of-way, and neighboring properties is also granted.

**BACKGROUND**

**A. The Present Dispute**

The Nation is a federally-recognized Indian tribe and is listed in the Notice of the Indian Entities Recognized and Eligible to Receive Services from the United States Department of the Interior, Bureau of Indian Affairs. Joint Stipulated Statement of Material Fact (SSOMF) ¶ 1, ECF No. 86; Pl.'s Statement of Proposed Undisputed Material Facts (PSUMF) ¶ 1, ECF No. 93. The Village is an incorporated municipality in Brown County, Wisconsin and is located wholly within the boundaries of the area set aside for the Nation by the Treaty of February 3, 1838. SSOMF ¶ 2; PSUMF ¶ 2. According to U.S. Census Bureau population estimates, as of July 1, 2017, the total Village population was 8,896, of which "White alone" residents comprise 79.9% and "American Indian and Alaska Native alone" comprise 12.2%. Def.'s Statement of Proposed Undisputed Material Facts (DSUMF) ¶ 127, ECF No. 91.

The Nation has conducted an annual event known as the Big Apple Fest since 2009. PSUMF ¶ 52. The event is held on the Nation's Cultural Heritage Grounds and Apple Orchards and includes activities such as apple picking, an apple pie contest, an apple press demonstration, a petting zoo, children's games, face painting, cardboard cow painting, hay rides, horse demonstrations, pottery and corn husk doll making, basket weaving, Indian and non-Indian food and produce vendors, and tours of the preserved historic Oneida homes. *Id.* ¶ 53. The 2016 Apple Fest drew as many as 8,128 attendees to the event. DSUMF ¶ 140.

Richard Figueroa, the Nation's Special Events Coordinator in the Tourism Division, is responsible for planning the Big Apple Fest. Figueroa coordinates the event with the Oneida Compliance Division, the Oneida Risk Management Department, the Oneida Environmental Health

3

and Safety Division, Oneida Conservation, the Oneida Utilities Department, the Oneida Public Works Department, Oneida Security, and the Oneida Police Department to ensure compliance with the Nation's laws. PSUMF ¶ 56. The Nation conducts the Big Apple Fest in conformity with its laws, specifically the Emergency Management and Homeland Security Ordinance; the Oneida Safety Law; the Oneida Vendor Licensing Ordinance; the Oneida Food Service Code; the Nation's On-Site Waste Disposal Ordinance; the Recycling and Solid Waste Disposal Law; the Sanitation Ordinance; and Oneida Tribal Regulation of Domestic Animals Ordinance. *Id.* ¶ 55.

On March 1, 2016, the Village adopted amended Ordinance No. 03-2016, Special Events Permit Ordinance. *Id.* ¶ 17; Chapter 250, Village of Hobart Municipal Code, ECF No. 86-1. The Ordinance provides:

> No person shall conduct a special event within the Village of Hobart without first having obtained a rental and/or special event permit. A special event permit may be issued to any person that the Village Administrator or his/her designee find appropriate.

ECF No. 86-1 at 3. The Ordinance defines "person" as "[a]ny person, firm, partnership, association, corporation, company, governmental entity, or organization of any kind." *Id.*

On September 2, 2016, counsel for the Village informed the Nation that it needed to apply for a permit under the Ordinance or the Village would enforce the Ordinance's penalty provisions. SSOMF ¶ 18. Although it submitted an Application by Municipality for Permission to Detour State Trunk Highway Traffic to the Wisconsin Department of Transportation and Brown County Public Works Director, *id.* ¶ 20, the Nation declined to apply for a permit from the Village and, on September 9, 2016, filed a motion for a preliminary injunction seeking to enjoin the Village from requiring that the Nation's 2016 Big Apple Fest comply with the provisions of the Ordinance. The

4

court denied the Nation's motion on September 13, 2016, finding that the Nation did not demonstrate that it would suffer irreparable harm since the Village agreed it would not seek to prevent the event from going on. The Nation held the Big Apple Fest as planned on September 17, 2016. *Id.* ¶ 19.

Some activities associated with the 2016 Big Apple Fest occurred on non-trust land owned by the Nation in fee simple, including parking and apple picking. DSUMF ¶ 134. During the Apple Fest, security officers, six Oneida Nation police officers, and a registered nurse were on site. PSUMF ¶¶ 58, 60. Two officers of the Hobart-Lawrence Police Department attended the 2016 Big Apple Fest. SSOMF ¶ 22. The Nation contracted with a third-party vendor to place road closure barricades for the event at the intersection of North Overland Road and Riverside Drive and to block both lanes of traffic for the portion of North Overland Road between the North Overland Road/Highway 54 intersection. DSUMF ¶¶ 135–36.

On September 21, 2016, the Village's Chief of Police issued Citation No. 7R80F51TJS against the Nation for failing to act in accordance with the Ordinance. The Nation filed an amended complaint on September 28, 2016, asserting that it, its officials, and its employees are immune from the Ordinance in the conduct of special events on the Nation's trust land and Reservation and that the Village lacks the authority to enforce the Ordinance against the Nation, its officials, and its employees. It seeks to enjoin the Village's attempt to impose the Ordinance on the Nation, its officials, and its employees and to enforce the Ordinance through citation or municipal court proceedings. It also seeks to enjoin the Village from enforcing Citation No. 7R80F51TJS against the Nation.

While the present dispute between the parties arises out of these recent events, its resolution requires consideration of the Nation's history in Wisconsin and the various shifts in federal Indian policy in the United States over the last 150 years. For this reason, both parties sought a significant period of time for discovery and have submitted extensive documentation and briefing in support of their respective positions. Recognizing the importance of the issues raised to both parties, the court begins its analysis with a consideration of the history to which both appeal.

**B. Historical Background**

The Oneida Tribe of Indians was one of six Iroquois Nations living in the area that later became the State of New York. In the years following the Revolutionary War, encroachment by the new Americans on their ancestral lands, as well as other factors, gave rise to a plan for the Oneida to move west to the Wisconsin Territory. On February 8, 1831, the United States entered into a treaty with the Menominee Tribe, which was already located in the Wisconsin Territory, under which the Menominee agreed to cede a tract of land to be set apart as a home to the several tribes of the New York Indians, including the Oneida. The tract of land was to be apportioned among the New York tribes "so as not to assign any tribe a greater number of acres than may be equal to one hundred for each soul actually settled upon the lands." PSUMF ¶ 3 (quoting Treaty with the Menominee, 1931, signed Feb. 8, 1831, 7 Stat. 342, ECF No. 92-10 at 4). The Treaty stated that ceded lands "are to be held by those tribes, under such tenure as the Menomonee [sic] Indians now hold their lands, subject to such regulations and alteration of tenure, as Congress and the President of the United States shall, from time to time, think proper to adopt." *Id.* ¶ 4 (quoting Treaty with the Menominee, 1931, signed Feb. 8, 1831, 7 Stat. 342, ECF No. 92-10 at 4). The Treaty with the Menominee was amended on February 17, 1831, to extend the three-year deadline by which the

New York tribes were to relocate to the ceded Menominee lands. *Id.* ¶ 6. On October 27, 1832, the United States entered into a third treaty with the Menominee to amend the February 8, 1831 Treaty to alter the boundaries of the tract ceded to the United States for the benefit of the New York tribes. The October 27, 1832 treaty provided that the terms of the February 8, 1831 Treaty, as amended, were otherwise confirmed. *Id.* ¶ 7.

Then, on February 3, 1838, the Oneida entered into a treaty with the United States in which it ceded to the United States their title and interest in the 1831 Menominee cession in return for reserving "to the said Indians to be held as other Indian lands are held a tract of land containing one hundred (100) acres, for each individual, and the lines of which shall be so run as to include all their settlements and improvements in the vicinity of Green Bay." *Id.* ¶ 8 (quoting Treaty with the Oneida, 1838, signed Feb. 3, 1838, 7 Stat. 566, Arts. 1 and 2, ECF No. 92-13 at 3). The number of Oneida who had emigrated to the Duck Creek area totaled 654, resulting in a tract of land consisting of approximately 65,400 acres. DSUMF ¶ 1. The United States agreed to survey the reserved tracts as soon as practicable. PSUMF ¶ 9. In December 1838, John Suydam surveyed the tract of land set aside in the Treaty of 1838. *Id.* ¶ 10. The map he created of the survey, labeled "Oneida Reservation," consisted of land in what would later become parts of Brown and Outagamie Counties in the State of Wisconsin. ECF No. 92-14. Commissioner of Indian Affairs Crawford wrote to Secretary of War Poinsett on February 7, 1839, advising that the terms of the Treaty of 1838 had been carried out. PSUMF ¶ 11.

Federal Indian policy changed dramatically as the nation grew, and in the late 19th century, Congress terminated the treaty-making process with individual tribes, 25 U.S.C. § 71, and moved toward a policy of allotment and assimilation. In 1887, Congress enacted the General Allotment

Act, commonly referred to as the Dawes Act, 25 U.S.C. § 331, *et seq.*, the purpose of which was the eventual assimilation of tribal members into the general population and the elimination of Indian reservations through the allotment of the land in severalty to the Indians residing on those reservations. The allotted lands were to be held in trust by the United States for a period of at least 25 years, after which Indian allottees were to receive fee patents, which removed all restraints on alienation and allowed transfer of the land to non-Indians. *See* 25 U.S.C. § 348. Once allottees received their patents, they were to "have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside." Act of February 8, 1887, 24 Stat. 388 at 390. It was believed that, within a generation or two, "the tribes would dissolve, their reservations would disappear, and individual Indians would be absorbed into the larger community of white settlers." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 335 (1998) (citing Hearings on H.R. 7902 before the House Committee on Indian Affairs, 73rd Cong., 2d Sess., 428 (1934)).

On September 16, 1887, Commissioner of Indian Affairs J.D.C. Atkins recommended to Secretary of the Interior John Noble that "the President be asked to authorize allotments in severalty to be made to the Indians on the Oneida Reservation, in Wisconsin, under the Act of February 8, 1887." PSUMF ¶ 14 (quoting ECF No. 92-17); DSUMF ¶ 5. The Secretary concurred and relayed the recommendation to President Benjamin Harrison in May 1889. PSUMF ¶ 17; DSUMF ¶ 5. The allotment of the Oneida Reservation to tribal members began in 1889. By 1891, with the exception of approximately eighty acres reserved for boarding school and day school purposes, as well as the small allotments of land for use in the satisfaction of additional claims to entitlement, a schedule containing 1,530 allotments with no surplus land remaining was submitted for approval. PSUMF ¶¶ 19, 22; DSUMF ¶ 6. In accordance with the provisions of the Dawes Act, trust patents dated

June 13, 1892, were issued to Oneida allottees, to remain in trust for twenty-five years. PSUMF ¶ 21; DSUMF ¶ 8.

After the individual tribal members, including members of the Oneida Tribe, received their allotments, but before the twenty-five-year trust period expired, they repeatedly petitioned the federal government for legislation granting the individual members fee simple title to their land. In response to such requests, Congress amended the Dawes Act through the Burke Act, 34 Stat. 182, 25 U.S.C. § 349, on May 8, 1906. The Burke Act gave the Secretary of the Interior the discretion to immediately issue fee patents to competent Indian allottees before the expiration of the twenty-five-year trust period required under the Dawes Act. Section 6 of the Burke Act provided that, upon issuance of the patent conveying the allotment in fee simple, "all restrictions as to sale, incumbrance, or taxation of said land [would] be removed." 25 U.S.C. § 349. During the same year, Congress passed an act making "appropriations for the current and contingent expenses of the Indian Department, for fulfilling treaty stipulations with various Indian tribes, and for other purposes." Act of June 21, 1906, 34 Stat. 325 ch. 3504. The June 21, 1906 Act included a provision authorizing the Secretary of the Interior to issue fee patents to fifty-six named Oneida allottees and, in the Secretary's discretion, "to issue a patent in fee to any Indian of the Oneida Reservation in Wisconsin for the lands heretofore allotted him." *Id.* The issuance of the patents would operate as a "removal of all restrictions as to the sale, taxation, and alienation of the lands so patented." *Id.*

In response to the allotment process, the Wisconsin state legislature in 1903 enacted legislation creating the towns of Hobart and Oneida in the area within the boundaries of the Oneida reservation in Brown County and Outagamie County. DSUMF ¶ 37. In 1908, the Brown County

Board of Supervisors vacated the town of Hobart as created in 1903 and reorganized the town from "all that portion of the Oneida reservation, situated in Brown County, Wisconsin." *Id.* ¶ 38 (quoting ECF No. 89-43).

Over the years that followed, Congress authorized the sale of trust patents held by non-competent allottees for their benefit, 34 Stat. 1015, at 1018, and authorized the issuance of fee patents to allotment purchasers, 35 Stat. 444, resulting in the issuance of fee patents for much of the allotted land. The twenty-five-year trust period for those allotments that remained in trust was set to expire on June 12, 1917. DSUMF ¶ 33. On March 24, 1917, a three-person competency commission recommended that fee patents be issued immediately to ten named Oneida allottees, that fee patents be issued to an additional twenty-two named Oneida allottees upon the expiration of the trust period on June 12, 1917, and that the trust period for all other allottees still holding allotments in trust on the area set aside in the Treaty of 1838 be extended. PSUMF ¶ 29; DSUMF ¶ 32. By 1917, over 50,000 acres of the 65,400-acre reservation fell out of Indian ownership. DSUMF ¶ 30. On May 4, 1918, President Woodrow Wilson signed an executive order extending the trust period by nine years for thirty-five named Oneida allottees. PSUMF ¶ 34; DSUMF ¶ 35. President Calvin Coolidge signed an executive order on March 1, 1927, extending the trust period for twenty-one named Oneida allottees. PSUMF ¶ 38; DSUMF ¶ 36. By the early 1930s, the Oneida Tribe owned less than 90 acres of the approximately 65,400 acres within the original boundaries of the area set aside in the 1838 treaty. DSUMF ¶ 98. Several hundred additional acres of individual allotments continued to be held in trust. *Id.* At least 95% of the land was no longer owned by Indians. *Id.* ¶ 95.

In 1934, Congress once again changed federal policy toward tribes through the passage of the Indian Reorganization Act (IRA), 25 U.S.C. § 450, *et seq.* The IRA put an end to the allotment process, 25 U.S.C. § 461; continued periods of trust upon Indian lands and restrictions on alienation indefinitely, 25 U.S.C. § 462; authorized the Secretary of the Interior to restore to tribal ownership the remaining surplus lands of any Indian reservation previously opened for public sale, acquire through purchase or otherwise any lands within or without existing reservations, and place them in trust for the purpose of providing land for Indians, 25 U.S.C. §§ 463, 465; and authorized tribes to adopt constitutions and by-laws, and organize their own governments under the supervision of the Secretary, 25 U.S.C. § 476. In 1936, less than two years after the enactment of the IRA, the Nation adopted its Constitution and Bylaws. PSUMF ¶ 49.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The fact that the parties filed cross-motions for summary judgment does not alter this standard. In evaluating each party's motion, the court must "construe all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing

11

sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. The 1838 Treaty and the Creation of a Reservation

The court begins with the parties' dispute regarding the origin and creation of the Oneida Reservation. In 1831, the United States entered into a treaty with the Menominee Tribe to acquire a 500,000-acre tract of land to be set apart as a home to several New York tribes, including the Oneida Tribe of Indians. This tract of land was to be apportioned among the emigrating New York tribes "so as not to assign any tribe a greater number of acres than may be equal to one hundred for each soul actually settled upon the lands." ECF No. 92-10 at 4. The treaty indicated further that the ceded lands were to be held by the New York Indian tribes "under such tenure as the Menomonee [sic] Indians now hold their lands, subject to such regulations and alteration of tenure as Congress and the President of the United States shall, from time to time, think proper to adopt." *Id.* Although the treaty was amended twice to extend the three-year deadline by which the New York tribes were to relocate to the ceded lands and to alter the boundaries of the ceded tract of land, the original terms of the 1831 treaty were otherwise confirmed.

The United States entered into a treaty with the Oneida on February 3, 1838. The Oneida ceded to the United States its interest in the 1831 Menominee land set apart for them in return for reserving "to the said Indians to be held as other Indian lands are held a tract of land containing one hundred (100) acres, for each individual." ECF No. 92-13 at 3. The land was subsequently surveyed by the United States. The survey, labeled "Oneida Reservation," consisted of 65,400 acres of land. The Nation asserts that this treaty created a reservation held in common by the Tribe. The

12

Village maintains that the Treaty provides for the reservation of individual 100-acre tracts for each member, rather than one reservation held in common by the Tribe.

In determining whether a reservation has been created, courts "ask whether the area has been validly set apart for the use of the Indians as such, under the superintendence of the Government." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 511 (1991) (citation omitted). When a party asserts that a treaty created a reservation, the "treaty is to be construed as the Indians would have understood it, as disclosed by the practices and customs of the Indians at the time the treaty was negotiated, and by the history of the treaty, the negotiations that preceded it, and the practical construction given the treaty by the parties." *United States v. Top Sky*, 547 F.2d 486, 487 (9th Cir. 1976) (internal citations omitted); *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999) (noting that courts must look "beyond the written words to the larger context that frames the treaty, the negotiations, and the practical construction adopted by the parties").

Here, the history leading up to the Treaty of 1838 demonstrates that the United States, the Menominee, and the Oneida engaged in negotiations regarding the relocation of the Oneida from New York to the ceded Menominee territory. The Treaty of 1838 provides that "there shall be reserved to the said Indians to be held as other Indian lands are held a tract of land containing one hundred (100) acres, for each individual." ECF No. 92-13 at 3. The Village argues that the reference in the Treaty of 1838 to "a tract of land containing one hundred (100) acres for each individual" means that the Treaty allotted land to individual members of the tribe rather than creating a reservation held in common. Yet, a reading of the Treaty in its entirety and consideration of the surrounding circumstances indicates that the language simply conveys how the United States

would calculate the amount of land that would be apportioned to the Oneida Tribe from the 500,000 acres of ceded Menominee land set apart for the New York tribes. Indeed, the 1831 Menominee Treaty stated that the ceded land was to be apportioned among the tribes "so as not to assign any tribe a greater number of acres than may be equal to one hundred for each soul actually settled upon the lands" and that those tracts would be held "as the Menomonee [sic] Indians hold their lands," which the 1831 Menominee treaty described as a "reservation." ECF No. 92-10 at 4. Although it is true that certain individual members of the Oneida Tribe sought to trade their participation in the Oneida Reservation in favor of more land elsewhere, the principal tribal leaders intended to establish a permanent home for the Tribe in Wisconsin and ultimately entered into a treaty with the United States to do so. The United States' December 1838 survey labels a single tract of land, totaling 65,400 acres, as the Oneida Reservation. Both the United States and the Tribe agreed that the survey satisfactorily reflected the parties' understanding of the Treaty. In short, the language of the 1838 Treaty, the history of the Treaty, the negotiations that preceded it, and the practical construction given the Treaty by the parties compel the conclusion that the lands were ceded to the Oneida Tribe as a reservation and not as individual allotments to its members. For these reasons, the court holds that the Treaty of 1838 created the Oneida Reservation.

**B. Current Boundaries of the Reservation**

**1. Issue Preclusion**

The Village contends that, even if the Treaty of 1838 created a reservation, Congress disestablished, or at the very least, diminished, the Oneida Reservation by legislative act. In support of its disestablishment argument, the Village argues at the outset that the Nation is collaterally estopped from relitigating the status of the Oneida Reservation by virtue of the 1933 decision of this

court which held that the Reservation was discontinued and ceased to exist. *See Stevens v. County of Brown* (E.D. Wis. Nov. 3, 1933) (unpublished decision), ECF No. 89-45. The court's decision in *Stevens*, the Village contends, has preclusive effect in this case.

Collateral estoppel, or issue preclusion, prevents the relitigation of issues resolved in an earlier lawsuit. "Issue preclusion . . . bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (internal quotation marks omitted). The doctrine "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979) (citation omitted). The prerequisites for applying the doctrine are satisfied when "(1) the issue sought to be precluded is the same as an issue in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action." *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014) (citation omitted).

The Nation maintains that it is not bound by the decision in *Stevens* because the Village has not satisfied the elements of issue preclusion. More specifically, the Nation asserts that it was not a party to the *Stevens* case and that there is no identity of issues between the issue in this case and the issue decided in *Stevens*. In *Stevens*, a plaintiff class consisting of Oneida tribal members and representatives brought an action against the counties of Brown and Outagamie as well as the townships of Hobart and Oneida to recover local property taxes that had been levied and assessed

on their lands as well as the lands of other Oneida tribal members.  The plaintiffs also sought an injunction against any further assessment, levy, or collection of property taxes.  The defendants moved to dismiss the case on four grounds: (1) the plaintiffs did not pursue the remedy outlined in Wis. Stat. § 74.73; (2) more than twenty years had elapsed since the creation of the towns without questioning their creation by a writ of certiorari or other appropriate proceeding as prescribed in the state statute; (3) the Oneida Reservation was lawfully discontinued; and (4) the doctrine of laches barred the plaintiffs from questioning the legality of the organization of the towns and their assumption of authority over the Oneida Reservation.  ECF No. 89-45 at 3.  The court concluded that, because the reservation had been discontinued through the implementation of the Dawes Act, the plaintiffs were bound by the state statute governing the procedure to recover taxes.

The Village asserts that, even though the Tribe was not a named party in the litigation, the complaint in that action indicates that the plaintiffs were duly authorized and empowered to act for and on behalf of the Oneida Tribe.  But the fact that the lawsuit was brought by members of the Tribe, rather than the Tribe itself, suggests that the Tribe was not fully represented in *Stevens* and did not itself participate in the proceedings.  Indeed, there is no evidence that the Tribe exercised a sufficient degree of control in *Stevens*.  *See* 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4451 (2017) ("Lesser measures of participation without control do not suffice.").

In addition, issue preclusion does not apply here because this case raises different factual and legal questions than those raised in *Stevens*.  "Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 4425.  Again,

16

the question raised in *Stevens* was whether individual members of the Tribe were required to pay local property taxes upon the issuance of fee patents for their allotments. The underlying issue in this case is whether the Nation is subject to the regulations of a local municipality in the conduct of its special events. Although similar issues regarding the reservation's status were raised in *Stevens*, that action was not a comprehensive adjudication of the true status of the reservation. In addition, the issue of whether the Nation itself is immune from local regulatory authority was not litigated in *Stevens* to any extent. *See Bernstein v. Bankert*, 733 F.3d 190 (7th Cir. 2013) (holding issue preclusion did not apply because the issues involved facts that were not "identical in all material aspects"). Because this case presents different facts and legal foundation, issue preclusion does not apply. The court will therefore turn to the Village's alternative argument that, even apart from the 1933 decision in *Stevens*, the Oneida Reservation was disestablished or diminished.

### 2. Disestablishment or Diminishment

At its core, the dispute between the Village and the Nation is over whether all or only some of the original Oneida Reservation constitutes "Indian country." "Although the term 'Indian country' has been used in many senses, it is most usefully defined as country within which Indian laws and customs and federal laws relating to Indians are generally applicable." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.04[1], at 183 (Nell, Jessup Newton ed. 2012). "Generally speaking, primary jurisdiction over land that is Indian country rests with the federal Government and the Indian tribe inhabiting it, not with the States." *Alaska v. Native Vill. of Venetie*, 522 U.S. 520, 527 n.1 (1998).

In 1948, Congress codified the definition of Indian country. That definition, which includes three different categories of land, reads as follows:

Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. Although located within the federal criminal code, "the Court has recognized that it generally applies as well to questions of civil jurisdiction." *DeCoteau v. Dist. Cty. Court for Tenth Judicial Dist.*, 420 U.S. 425, 427 n.2 (1975).

Prior to the enactment of § 1151, land within a reservation's boundaries was held to be no longer Indian country when Indian title was extinguished. *See, e.g.*, *Clairmont v. United States*, 225 U.S. 551 (1912) (vacating conviction for selling or giving intoxicating liquor to Indian on ground that railroad right-of-way, where offense occurred, had been conveyed in fee to railroad and thus was no longer Indian country). But § 1151 "abrogated this understanding of Indian country and, with respect to reservation lands, preserves federal and tribal jurisdiction even if such lands pass out of Indian ownership." *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1007 (8th Cir. 2010) (citing *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 357–58 (1962)); *see also Solem v. Bartlett*, 465 U.S. 463, 468 (1984) ("Only in 1948 did Congress uncouple reservation status from Indian ownership, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries."). Thus, the question before the court is whether the Oneida Reservation was disestablished or diminished before § 1151 became effective.

"Although the terms 'diminished' and 'disestablished' have at times been used interchangeably," as the court explained in *Yankton Sioux Tribe v. Gaffey*, 188 F.3d 1010, 1017 (8th

18

Cir. 1999), "disestablishment generally refers to the relatively rare elimination of a reservation while diminishment commonly refers to the reduction in size of a reservation." The Nation correctly observes that "[b]ecause the Reservation was created by a treaty, only Congress can diminish or disestablish it." Pl.'s Br. in Supp. of Mot. for Summ. J., ECF No. 96, at 36. This follows from the Supremacy Clause of the United States Constitution, under which the Constitution, laws, and treaties of the United States are the supreme law of the land and control over the enactments of states and local governments. U.S. Const. art. VI.

Moreover, courts will not lightly conclude that an Indian reservation has been disestablished or diminished. *DeCoteau*, 420 U.S. at 444 ("This Court does not lightly conclude that an Indian reservation has been terminated."); *Solem*, 465 U.S. at 470 ("Diminishment, moreover, will not be lightly inferred."). The congressional intent to disestablish or diminish a reservation must be clear. This is because of the general rule that doubtful expressions are to be resolved in favor of the Indian tribes "who are the wards of the nation, dependent upon its protection and good faith." *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 174 (1973) (quoting *Carpenter v. Shaw*, 280 U.S. 363, 367 (1930)). Accordingly, "[o]nce a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Solem*, 465 U.S. at 470.

To determine whether an Indian reservation has been disestablished or diminished, the court must look first to the statutory text of the relevant statute, reasoning that it is "[t]he most probative evidence of congressional intent." *Id.* at 469; *see also Nebraska v. Parker*, 136 S. Ct. 1072, 1079 (2016) ("[W]e start with the statutory text, for '[t]he most probative evidence of diminishment is, of course, the statutory language used to open Indian lands.'" (citation omitted) (second alteration

19

in original)).  Courts next examine the circumstances surrounding the passage of the act, "particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress."  *Solem*, 465 U.S. at 471; *Parker*, 136 S. Ct. at 1079.  Finally, courts "look to the subsequent treatment of the area in question and the pattern of settlement there."  *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351–52 (1998); *see also Parker*, 136 S. Ct. at 1079.  "When both an act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening."  *Solem*, 465 U.S. at 472.

In cases where disestablishment or diminishment is alleged to have resulted from surplus land acts, such as *Solem* and *Parker*, the Court has observed that common "hallmarks of diminishment" include "'[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests' or 'an unconditional commitment from Congress to compensate the Indian tribe for its opened land.'" *Parker*, 136 S. Ct. at 1079 (quoting *Solem*, 465 U.S. at 470–71) (alteration in original). Examples of termination language contained in surplus land acts found to show congressional intent to diminish or disestablish include: "the Smith River reservation is hereby discontinued," *Mattz v. Arnett*, 412 U.S. 481, 505 n.22 (1973); "the reservation lines of the said Ponca and Otoe and Missouria Indian reservations . . . are hereby, abolished," *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 618 (1977); "the . . . Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest," *DeCoteau,* 420 U.S. at 455–56; and "[t]he said Indians belonging to the Shoshone or Wind River Reservation, Wyoming, for the consideration hereinafter named, do hereby cede, grant, and relinquish to the United States, all right,

title, and interest which they may have to all the lands embraced within the said reservation, except the lands within and bounded by the following lines," *Wyoming v. United States Envt'l Prot. Agency*, 875 F.3d 505, 518 (10th Cir. 2017).

But this case does not arise under a surplus land act. There was no surplus land act passed in connection with the Oneida Reservation because it was not contemplated that there would be surplus land remaining after the land within the Reservation was allotted to individual tribal members and fee patents finally issued. It would make no sense for an allotment act to contain the type of cession language that is found in surplus land acts or terms like "surrender, grant, or convey." Those terms have no place in the context of allotment. In the process of allotment, the tribes were not conveying surplus lands to the United States; instead, the United States was conveying its interest in the lands it had held in trust for the benefit of the tribes to the individual tribal members and terminating the restrictions that had previously applied to it. For the same reason, allotment acts would not contain language indicating that the Indian tribes would be compensated for the allotted lands. The land was not being conveyed to outsiders by the tribe, but instead divided among the tribal members free of all federal restrictions.

Notwithstanding the absence of such language, the intent of the allotment policy in general and the Dawes Act in particular is unmistakable. It was "to hasten the demise of the reservation system and to encourage Indian assimilation into the white system of private property ownership." *Podhradsky*, 606 F.3d at 999. As noted above, "[w]ithin a generation or two, it was thought, the tribes would dissolve, their reservations would disappear, and individual Indians would be absorbed into the larger community of white settlers." *Yankton Sioux Tribe*, 522 U.S. at 335. But even though complete assimilation of the Indians and the elimination of the reservation system was the

ultimate intent of the Dawes Act and related legislation, those acts did not themselves abolish the reservations. In fact, they assumed the reservations would continue at least until the trust patents were replaced with fee patents giving individual tribal members complete control over their own land. Before that process was complete, however, Congress changed its mind as reflected in the IRA of 1934.

The purpose of the IRA was to stop the loss of Indian lands through the allotment process and re-establish tribal governments and land holdings. COHEN, § 1.05, at 81–82. As noted above, among other steps taken to achieve these goals, the IRA terminated the further allotment of reservation lands, extended unexpired trust periods on allotted lands, and empowered the Secretary of the Interior to acquire lands to be placed into trust status and thus exempt from state and local taxation. 25 U.S.C. §§ 463, 465. The IRA also "permitted tribes to organize and adopt constitutions with a congressional sanction of self-government, and it permitted tribes to form business committees or business corporations." 25 U.S.C. § 476.

Within two years of the passage of the IRA, the Oneida Tribe adopted its Constitution and By-Laws, and the Oneida tribal government was formed. Since that time the Oneida Tribe, now known as the Oneida Nation, has remained in existence with a functioning tribal government. Although the precise number of acres may be in question, it is undisputed that at least some amount of land remained under tribal ownership or otherwise in trust status at the time the IRA was enacted, putting a complete stop to the further alienation of tribal lands. DSUMF ¶ 98. It thus follows that the Oneida Reservation has not been disestablished.

But while it has not been disestablished, the size of the Reservation has been significantly diminished as a result of the issuance of fee patents to tribal members who then conveyed their

22

interests to non-tribal members. This is because Congress's intent to diminish, if not disestablish, the Reservation, which was explicit in the Dawes Act, the Burke Act, and the Act of 1906, became effectuated with the issuance of fee patents to tribal members and the subsequent sale of the land to non-Indians. The intent to diminish was born out by Congress singling out the Oneida Reservation, in particular, and allowing the Secretary to quickly issue fee patents at his discretion.

The Nation argues that the Dawes Act and the Burke Act have never been construed to alter reservation boundaries. Indeed, the mere act of dividing the Reservation into individual allotments for each member, by itself, is insufficient to divest the land of its reservation status. *See United States v. Celestine*, 215 U.S. 278, 287 (1909) ("It is clear that the allotment alone could not [revoke the reservation]."). After all, the lands allotted to a tribe's members were set apart for the tribe and remained under the federal government's care and control. *United States v. Pelican*, 232 U.S. 442, 449 (1914) ("[W]e are unable to find ground for the conclusion that [Indian lands] became other than Indian country through the distribution into separate holdings, the Government retaining control."). But we are not talking here about allotment, by itself. Once the allotment trust period had run its course or was otherwise terminated, the Secretary, acting under the authority granted him by Congress, issued patents conveying the land in fee, free of all restrictions, to the individual tribal members. Once the fee patents were issued, the federal government no longer retained control of the land, as the land was converted into fee simple and owned by the individual tribal member. At that point, the intent unequivocally expressed by Congress in its enactment of the allotment acts was realized and either then or with the further conveyance of the land to non-Indians, the original reservation was diminished.

These facts distinguish this case from both *Celestine* and *Pelican*. In *Celestine*, the Indian defendant challenged his federal murder conviction on the ground that the United States district court lacked jurisdiction because the crime occurred on land within the exterior boundaries of the reservation, but which had been allotted to him and for which he had been granted a patent. 215 U.S. at 280. Notwithstanding the issuance of a patent, the Court held that the land remained part of the reservation because Congress had taken no steps to exclude the allotted land from the reservation. *Id.* at 284. Unlike this case, the patent issued to the defendant in *Celestine* contained "conditions against alienation or leasing, exemption from levy, sale, or forfeiture, not to be disturbed by the state without the consent of Congress . . . ." *Id.* at 286. And unlike this case, the defendant Indian had remained in possession of the property.

Similarly, in *Pelican*, the Indian defendant challenged his federal indictment for murder on the same ground, claiming that the crime occurred on another Indian's allotment and was therefore not within Indian country. 232 U.S. at 444. The district court agreed and sustained the defendant's demurrer. However, the Supreme Court reversed, holding that "[a]lthough the lands were allotted in severalty, they were to be held in trust by the United States for twenty-five years for the sole use and benefit of the allottee, or his heirs, and during this period were to be inalienable." *Id.* at 447. Explaining further, the Court stated, "[t]hat the lands, being so held, continued to be under the jurisdiction and control of Congress for all governmental purposes relating to the guardianship and protection of the Indians, is not open to controversy." *Id.* Again, unlike this case, no fee patent had been issued and the original tribal member remained in possession.

The conclusion that the issuance of fee patents and sale of the land following allotment diminished the reservation is also consistent with, if not compelled by, the Seventh Circuit's

decision in *Wisconsin v. Stockbridge-Munsee Community*, 554 F.3d 657 (7th Cir. 2009). In that case, the State of Wisconsin sued the Sockbridge-Munsee Tribe seeking an injunction enjoining the Tribe's gambling operation and a declaration of the current boundaries of the Tribe's reservation. The Tribe counterclaimed for a declaration that the golf course and supper club complex it had purchased was within the boundaries of the reservation created by its 1856 treaty with the United States such that it could operate slot machines at that location under a contract with the State of Wisconsin entered into pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq*. The golf course and supper club complex were located within the boundaries of the Tribe's original reservation, but it was in a section that had been sold to timber companies in 1871. 554 F.3d at 661. The unsold land within the reservation boundaries was later allotted to tribal members pursuant to a 1906 act of Congress, and eventually sold off. After passage of the IRA, the Department of the Interior had worked with the Tribe in the 1930s to reacquire parts of the land described in the 1856 treaty, rededicating the property as the Tribe's reservation. *Id*. Based on the previous history, however, the State argued that the 1856 reservation was diminished by the 1871 Act's sale of reservation land to timber companies, and then extinguished by the 1906 Act. The district court agreed, granting the State's motion for summary judgment, and the Seventh Circuit affirmed. Notwithstanding the absence of "the hallmark language" suggesting that Congress intended to disestablish or diminish the reservation in the 1906 Act, the court concluded that the circumstances surrounding it and the manner in which the reservation was treated in the aftermath of the Act made clear Congress's intent to extinguish the reservation:

> The intent to extinguish what remained of the reservation is born out by the act's provision for allotments in fee simple. This provision sets the 1906 Act apart from most allotment acts, like the 1871 Act, which restricted the Indian owners from

selling their land or required that it be held in trust by the United States. 3 *Cohen's Handbook of Federal Indian Law* § 3.04.3; *see, e.g.*, Dawes Act, ch. 119, 24 Stat. 388, 389 (1887). Why include this peculiar provision? Because the reservation could only be abolished if the tribal members held their allotments in fee simple. *See Mattz*, 412 U.S. at 496 ("When all the lands had been allotted and the trust expired, the reservation could be abolished."). By 1910, all the land in the 1856 reservation was sold to non-Indians or allotted in fee simple, which meant that Congress paved the way for non-Indians to own every parcel within the original reservation and ensured that the reservation could be immediately extinguished.

*Id.* at 664–65. As for the manner in which the reservation was treated after the Act, the court noted that "the land became subject to state taxes, and the Department of the Interior refused to intervene in alcohol-related problems within the original reservation." *Id.* at 665. And when in the 1930s, the Department of Interior worked with the Tribe to reacquire parts of its 1856 reservation, it declared the newly reacquired land to be the Tribe's reservation. *Id.* Though "there were exceptions to this understanding," the court held, "the aberrational statements are not enough to overcome the clear record showing Congress's intent to extinguish the reservation and the otherwise consistent treatment of the reservation as disestablished." *Id.*

Strong support for the conclusion that the sale of fee patented land to non-Indians resulted in a diminishment of the reservation can also be found in the series of cases involving the Yankton Sioux Tribe of South Dakota. The dispute there initially arose out of an effort by the Yankton Sioux Tribe to regulate a landfill within the boundaries of its original reservation, over which the State of South Dakota claimed jurisdiction. The original boundaries of the Yankton Sioux Reservation were defined in an 1858 treaty between the United States and the Yankton Sioux Tribe to include approximately 430,000 acres of land in what is now Charles Mix County, South Dakota. *South Dakota v. Yankton Sioux Tribe*, 522 U.S. at 334. Under the Dawes Act, about 167,325 acres of the reservation were allotted and patented, and then an additional 95,000 acres were allotted after the

passage of an Act of February 28, 1891. The allotments, which totaled approximately 262,300 acres, were not contiguous parcels and were interspersed with approximately 168,000 acres of unallotted surplus land. The 168,000 acres of unallotted lands were then ceded to the United States through an Act of August 15, 1894. *Id.* at 336–38. The landfill at the center of the dispute was located on non-Indian fee land within the ceded portion of the original reservation boundaries. *Id.* at 333. The Tribe and the federal government claimed that, because the site was located within the reservation's original 1858 boundaries, it remained part of the reservation and was therefore subject to federal environmental regulations. The State of South Dakota, on the other hand, argued that the 1894 divestiture of Indian property resulted in the disestablishment, or at least the diminishment, of the Tribe's reservation, such that the ceded lands no longer constituted "Indian country" under 18 U.S.C. § 1151(a) and thus the State had primary jurisdiction over the facility. *Id.* at 340–41.

Although the Tribe prevailed in the lower courts, the Supreme Court reversed. Finding that the plain language of the 1894 Act of Congress ratifying the agreement between the Tribe and the Yankton Indian Commission for the ceding of unallotted lands to the United States evinced a congressional intent to diminish the reservation, the Court concluded that the site for the facility was not within the reservation boundaries and thus the State had jurisdiction over it. *Id.* at 351. The Court limited the scope of its decision to the status of the ceded lands, however, and remanded the case for further proceedings. It explicitly avoided deciding whether Congress had disestablished the reservation altogether. *Id.* at 358.

On remand, the district court consolidated the case with an action brought by the Tribe to challenge state criminal jurisdiction over acts of tribal members on nonceded land within the original reservation boundaries. *Yankton Sioux Tribe v. Gaffey*, 188 F.3d at 1013. After an

evidentiary hearing, the district court held that the reservation had not been disestablished and still included all land within the original exterior boundaries that was not ceded to the United States by the 1894 Act. It then issued a permanent injunction enjoining state officials from exercising criminal jurisdiction over tribal members on "allotted or reserved lands." *Id.* On appeal, the Eighth Circuit Court of Appeals affirmed the district court's conclusion that the reservation had not been disestablished. But it reversed the court's conclusion that the original exterior boundaries of the reservation continued to have effect and that all nonceded lands remained as part of the reservation. *Id.* In so ruling, the court recognized at the outset that the 1894 Congress operated on a set of assumptions that conflicted with modern definitions of Indian country. It observed that "Indian lands were defined to include 'only those lands in which the Indians held some form of property interest: trust lands; individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians.'" *Id.* at 1022 (quoting *Solem*, 465 U.S. at 468). "Lands to which the Indians did not have any property rights were never considered Indian country," the court observed. *Id.* The court also acknowledged that because Congress in the late nineteenth century operated on the assumption that reservations would soon cease to exist, the "1894 Congress would have felt little pressure to specify how far a given act went toward diminishing a reservation and would have had no reason to distinguish between reservation land and other types of Indian country." *Id.* (citing *United States v. S. Pacific Transp. Co.*, 543 F.2d 676, 695 (9th Cir. 1976)). Though the court observed that this background informed the court's inquiry into whether Congress intended to eliminate the reservation through the 1894 Act, it noted that "courts have not been willing to extrapolate from general legislative assumptions and expectations of the late nineteenth century to find in each surplus land act a specific congressional purpose to remove all lands not

28

under Indian control from reservation status." *Id.* at 1024 (citing *Solem*, 465 U.S. at 468–69). After reviewing the record and the arguments of the parties, the court found that neither the text of the 1894 Act nor the evidence of the parties' contemporaneous understandings established a clear congressional intent to disestablish the Yankton Sioux Reservation. *Id.* at 1027.

The court did conclude, however, that the 1894 Act "intended to diminish the reservation by not only the ceded land, but also by the land which it foresaw would pass into the hands of the white settlers and homesteaders." *Id.* at 1028. The court explained that approximately three-fifths of the Yankton Sioux Reservation was allotted under the Dawes Act and the 1891 Act. Until the Indian allottees would receive their lands in fee and the trust period over them would end, they could not convey land to non-Indians. *Id.* The court noted that at least eighty-five percent of the allotted land eventually passed out of trust status and most of that land was sold in fee to non-Indians; by 1930, tribal members held only 43,358 acres of the 262,300 acres that had been originally allotted. *Id.* at 1016.

"The Act could not foresee all that would happen in the future with population movement, state development, and changing Indian policy," the court explained, "but it contained provisions showing concern for future interests of the Indians in common, as well as provisions recognizing that conditions were sure to change as white settlers moved in to the opened reservation with the expectation of state support." *Id.* at 1028. And "as more white settlers came on to the opened lands," the court explained, "increased state involvement on their behalf was expected, and the jurisdiction of the State was expected to increase over time." *Id.* In addition, "some articles of the Act reflect the parties' assumption that an allottee who received full title at the end of the trust period would become subject to the civil and criminal laws of the State or territory in which he

resided." *Id.* The court found that "nothing in its text or the circumstances surrounding its passage

suggests that any party anticipated that the Tribe would exercise jurisdiction over non Indians who

purchased land after it lost its trust status." *Id.* Though the court determined that the 1894 Act

intended to diminish the reservation, it concluded that it could not define the precise limits of the

remaining reservation and remanded the case to the district court with instructions to further develop

the record and to determine what categories of land comprised the diminished reservation. *Id.* at

1030.

On remand, the district court found that four categories of trust lands remained part of the

reservation and thus within the definition of Indian country: land which was reserved to the federal

government in the 1894 Act and was subsequently returned to the Tribe, land which had been

allotted to individual Indians and was still held in trust, land which was taken into trust under the

IRA, and land which had been continuously owned in fee by individual Indians. *Yankton Sioux*

*Tribe v. Podhradsky*, 529 F. Supp. 2d 1040, 1058 (D.S.D. 2007). Non-Indian fee lands, consisting

of lands ceded to the United States or allotted to tribal members and transferred in fee to non-

Indians and which had not been reacquired in trust, were excluded. Both sides appealed.

On this last appeal, the Eighth Circuit vacated the district court's holding that fee lands that

had continuously remained in Indian ownership were still part of the reservation. In all other

respects, the district court's decision was affirmed. 606 F.3d at 1015. In upholding the district

court's determination that allotted lands that retained their trust status were still part of the Yankton

Sioux Reservation, the Eighth Circuit observed that the "simple act of dividing the Yankton Sioux

Reservation into individual allotments was insufficient to divest the allotted lands of their

reservation status" and that there was "no indication in the historical record that either Congress or

the Tribe expressly intended to eliminate the reservation status of the Yankton allotted lands immediately upon allotment or upon the sale of the Tribe's surplus holdings." *Id.* at 1008. "It thus follows," the court concluded, that "the allotted lands held in trust retained the same reservation status they had enjoyed since the original 1858 Treaty." *Id.* at 1008–09. As for lands within the original boundaries of the reservation that were taken back into trust by the United States after the enactment of the IRA, the court noted that "[b]y taking former Yankton Sioux Reservation lands back into trust under the IRA, the Secretary effectively exercised his authority to consolidate the Tribe's land base by restoring reservation status to former pieces of a reservation in existence since 1858." *Id.* at 1012. With respect to fee lands continuously owned in fee by Indians, the court found no evidence in the record that any such land existed and therefore vacated the district court's conclusion that such lands would remain part of the reservation. *Id.* at 1015. That fee lands lawfully sold to non-Indians were no longer part of the reservation was virtually unquestioned.

I find this line of cases instructive for the issues before me here. Just as the Eighth Circuit concluded in *Gaffey* and *Podhradsky* that fee lands conveyed to non-Indians were no longer part of the Yankton Sioux Reservation, so also I conclude that the fee lands within the original boundaries of the Oneida Reservation that were sold to non-Indians, unless reacquired and placed into trust by the federal government, are no longer a part of that Reservation. The loss of that land has necessarily resulted in the diminishment of the Reservation from its original boundaries. Nothing in the text of the Dawes Act or the Act of 1906 suggest that Congress anticipated that the Nation would exercise jurisdiction over non-Indians who purchased land after it lost its trust status. Congress knew based on the Burke Act, which was enacted less than one month before the Act of 1906, that allottees who were issued fee patents would become subject to the civil and criminal laws

of the State or territory in which they resided.  *See* 25 U.S.C. § 349 ("[A]t the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee . . . then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside.").  It thus follows that as more non-Indian settlers purchased lands held in fee from Oneida members, increased involvement by the state on the settlers' behalf was expected, thereby increasing the State's jurisdiction over time.  *See Montana v. United States*, 450 U.S. at 559 n.9 (1981) ("It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government."); *see also Solem*, 465 U.S. at 471 n.12 ("When an area is predominately populated by non-Indians with only a few surviving pockets of Indian allotments, finding that the land remains Indian country seriously burdens the administration of State and local governments.").  By distributing reservation land through allotment and taking a definitive and considered step in allowing the Secretary to expedite the issuance of fee patents to Oneida members, Congress understood that the Nation would be divested of its authority once the allotment process was complete.  In short, a reading of the Dawes Act and the Act of 1906 and an examination of the historical context in which they were enacted establish that Congress intended to diminish the Oneida Reservation by the land which it foresaw would become fee simple patents and would subsequently pass out of Indian ownership into the hands of white settlers.  The issuance of fee patents and the subsequent transfer of fee title to those lands effectuated that intent.

The remaining evidence regarding the subsequent treatment of the land after the enactment of the Act of 1906 supports this conclusion.  The parties have presented volumes of material

evidencing the subsequent treatment of the land after the passage of the Act of 1906. As noted above, to a lesser extent, courts should consider "Congress's own treatment of the affected areas, particularly in the years immediately following the opening," as well as "the manner in which the Bureau of Indian Affairs and local jurisdictional authorities dealt with unallotted open lands." *Solem*, 465 U.S. at 471. "[A]s one additional clue as to what Congress expected would happen," courts also "look to the subsequent demographic history of opened lands." *Id.* at 471–72. At the same time, it is not uncommon for the subsequent treatment evidence to be "so rife with contradictions and inconsistencies as to be of no help to either side." *Id.* at 478.

That appears to be the case here on the issue of disestablishment. For instance, the Village, on the one hand, asserts that certain federal officials in the Office of Indian Affairs as well as superintendents of the Keshena Agency repeatedly referred to the area as a former reservation and note that the Oneida lost almost all of their land. The Nation, on the other, asserts that these views did not represent a consensus among federal officials on the status of the Oneida Reservation and that the remaining documents are ambiguous on disestablishment. References to the "former reservation," for example, could simply mean the "original reservation," as opposed to the substantially diminished reservation that resulted from the sale of their allotments by tribal members and that continued to exist up until the passage of the IRA. Such language could also reflect the common assumption during the allotment era that reservations were in the process of becoming extinct. But as noted above, before that process was complete, Congress enacted the IRA and ended it. The Village's evidence of the aftermath of the 1906 Act does not overcome this undisputed fact, especially considering that subsequent treatment is the "least compelling evidence" in the court's diminishment analysis. *Parker*, 136 S. Ct. at 1082.

The subsequent treatment of the land in question does support the conclusion that the Oneida reservation was diminished, however. The numerous statements of federal officials referring to the "former reservation," even if ambiguous as to disestablishment, at least manifest the view that the original boundaries were no longer intact. Just as in *Stockbridge-Munsee*, "the land became subject to state taxes, and the Department of the Interior refused to intervene in alcohol-related problems within the original reservation." 554 F.3d at 665. In 1903, the Wisconsin legislature enacted legislation to create the towns of Hobart and Oneida "from the territory now embraced within the Oneida Reservation in said counties" and conferred upon them "all the rights, powers and privileges conferred upon and granted to other towns in the state of Wisconsin." DSUMF ¶ 37. Soon thereafter, each town formed its own government. This court's decision in *Stevens*, though not entitled to preclusive effect, also constitutes evidence of the manner in which the Reservation was viewed by federal officials prior to the enactment of the IRA and demonstrates that once fee patents were granted, local property taxes were assessed.

Other state and federal officials also viewed the Oneida Reservation as at least diminished. In 1919, the Office of Indian Affairs, the predecessor to the Bureau of Indian Affairs, closed the Oneida Agency and transferred jurisdiction over the Oneida to the Keshena Agency, located on the Menominee Reservation. *Id.* ¶ 53. In 1931, the Attorney General of the State of Wisconsin wrote a letter addressing jurisdiction with respect to the Oneida in which he stated:

> There is very little tribal land left, and most of the individual allotments have passed from the control of the United States and are therefore subject to the unquestioned jurisdiction of the state. However, in the case of the small amount of tribal land remaining and the individual allotments which are still held in trust, the federal courts would have jurisdiction . . . . Most of the Oneidas have received a fee patent discharged of any trust. Many of them have sold their lands. The state has jurisdiction over those Indians that have a fee patent.

*Id.* ¶ 76.  On November 19, 1931, C.J. Rhoads, the Commissioner of Indian Affairs, wrote to a member of the Tribe concerning hunting and fishing rights:

> Generally speaking, the State game laws apply to the Indians except when exercising their hunting and fishing privileges on tribal Indian land within their reservation or, if allotted, within the limits of their own allotments still held in trust or under restricted patents.
>
> There are only a few small tracts of tribal Indian land within the limits of what was formerly the Oneida Indian Reservation.  The ceded land to which the Indian title has been extinguished no longer belongs to the Indians, and as you have received a fee patent to your . . . land and the Oneida Indian Reservation has been broken up, you would have no special hunting or fishing privileges thereon because of the fact that you are an Indian.  Under the circumstances you should comply with the state laws and regulations as to season, license, etc.

*Id.* ¶ 78.

This and other similar evidence cited by the Village supports the conclusion that in the aftermath of the 1906 Act and up until the enactment of the IRA, the Oneida Reservation was substantially diminished, though not completely disestablished.  In 1975, the United States Department of the Interior's Bureau of Indian Affairs issued a report entitled "Statistical Data for Planning Oneida Reservation," which stated that "the total acreage of this reservation is 2,581 acres—2,108 acres are tribally owned and 473 acres are allotted."  *Id.* ¶ 123.  The report noted that "by 1930 only a thousand acres remained.  In 1934, through a series of land purchases, the acreage was increased to the present amount."  *Id.*

As the Village points out, and as this court noted in a previous case between the parties, in more recent years the Nation has made substantial purchases of land within the original reservation boundaries.  *Id.* ¶¶ 128–29; *Oneida Tribe of Wis. v. Vill. of Hobart*, 542 F. Supp. 2d 908, 913 (E.D. Wis. 2008).  But the Nation's purchase of property on the open market does not by itself increase

the size of its Reservation. *See City of Sherrill, N.Y. v. Oneida Nation of N.Y.*, 544 U.S. 197, 202–03 (2005) ("Given the longstanding, distinctly non-Indian character of the area and its inhabitants, the regulatory authority constantly exercised by New York State and its counties and towns, and the Oneidas' long delay in seeking judicial relief against parties other than the United States, we hold that the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue. The Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders."). As of December 28, 2017, however, 14,078.612 acres of the original Reservation are held in trust on behalf of the Nation. Def.'s Statement of Additional Proposed Undisputed Material Facts ¶ 12, ECF No. 100. The record is silent, however, as to how much of the total acreage held in trust is within the Village, but this acreage reflects the current size and location of the Oneida Reservation.

## C. Enforcement of the Ordinance

It follows from the foregoing that the Village may enforce the Ordinance on those lands not held in trust by the United States for the benefit of the Nation. There is no dispute that the activities associated with the Big Apple Fest take place at least in part on land that is not part of the Oneida Reservation but instead is non-trust land owned by the Nation in fee simple. It is also undisputed that in order to conduct its festival, the Nation closes off, in whole or in part, streets and highways that are also not part of the current reservation. As the Village notes, the stated purpose of the Ordinance is "to address potential impacts on the general public of a special event, including without limitation noise, light, dust, traffic, parking, and other public health safety and welfare concerns," as well as "to promote the economic welfare and general prosperity of the community by safeguarding and preserving property values by addressing potential impacts of a special event."

Def.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 94, at 48 (citing ECF No. 86-1, § 250-2). These are lawful purposes under the Village's police power, Wis. Stat. § 61.34 (2017–18), and the Nation does not contend that they are not. Nor does the Nation contend that compliance would create a hardship or that the Village would unreasonably deny it a permit. Instead, the Nation's sole argument is that it is immune and not subject to the Ordinance because it's special event occurs within the boundaries of its 1838 Reservation boundaries, the entirety of which it claims constitutes Indian country. For the reasons set forth above, the court concludes that it does not and instead holds that only those portions of the original Reservation held in trust by the United States for the benefit of the Nation, as well as any allotments still under trust patents, constitute Indian country.

In truth, the implications of the Nation's argument are quite breathtaking. If accepted, then not only are the Nation and its members immune from the regulatory measures of the Village, but also those of a substantial portion of the City of Green Bay, Brown and Outagamie Counties, and the State of Wisconsin. To hold in its favor would mean that the Nation has primary jurisdiction over land largely populated by people who have no say in its governing body. Because the Oneida Reservation has been diminished, however, and does not include land held in fee, the Nation's argument fails. The Nation is therefore not entitled to the relief it seeks, and the Village's motion for summary judgment will be granted.

### D. The Nation's Sovereign Immunity

As a final matter, the Nation asserts that its sovereign immunity bars the Village's counterclaim for enforcement of the Ordinance against the Nation and the payment of the $5,000 fine issued through the citation. It is well established that Indian tribes possess immunity from suit traditionally enjoyed by sovereign powers. *See, e.g., Okla. Tax Comm'n v. Citizen Band*

*Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991). In other words, tribes are protected from suits for monetary damages. *See Quinault Indian Nation v. Pearson for Estate of Comenout*, 868 F.3d 1093, 1096 (9th Cir. 2017). "[A]n Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived immunity." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998). The Village acknowledges that the Supreme Court has held tribal immunity bars claims against an Indian Tribe arising from commercial activity outside Indian lands. *See Michigan v. Bay Mills Indian Cmty*, 572 U.S. 782 (2014). It nevertheless argues that the bar is not complete if an alternative mechanism is not available for the enforcement of its Ordinance. *See id.* at 795.

But as the Court suggested, the Village in this case may have other tools that it can use to enforce its laws on its own lands, for example, bringing a suit against tribal officers responsible for unlawful conduct. *Id.* As an extreme measure, the Village could presumably act to shut down the event if the Nation again sought to hold it without a permit, but there is no reason to believe that such an extreme measure will be necessary. The Nation brought this action to vindicate its sincerely held belief that it is not subject to the authority of the Village in the enforcement of the Ordinance. Should it not ultimately prevail, there is no reason to believe that the Nation will not comply with the Ordinance. In any event, the Nation is immune and the Village's counterclaim for monetary damages must be dismissed.

## CONCLUSION

For the reasons set forth above, I conclude that the Treaty of 1838 created the Oneida Reservation. I also conclude that, while there is no evidence of congressional intent to disestablish the Reservation, Congress's intent to at least diminish the Reservation is manifest in the Dawes Act and the Act of 1906, and that intent was effectuated with the issuance of unrestricted fee patents for

the allotted land within the Reservation. To the extent the Nation's special event was held on property not held in trust by the United States, it is subject to the Ordinance. In addition, the Village's counterclaim for monetary damages is barred and must be dismissed. The Nation's motion for summary judgment (ECF No. 85) is therefore **GRANTED-IN-PART** and **DENIED-IN-PART** and the Village's motion for summary judgment (ECF No. 84) is accordingly **GRANTED**. The Clerk is directed to set the matter for a telephone conference to address the need for further proceedings as well as the form of the judgment to be entered.

      **SO ORDERED** at Green Bay, Wisconsin this   28th   day of March, 2019.

                                s/ William C. Griesbach
                                William C. Griesbach, Chief Judge
                                United States District Court